UNITED STATES BANKRUPTCY COURT
FOR THE
WESTERN DISTRICT OF KENTUCKY

In re:   Mark Joseph Smith

       Debtor                                  CASE NO. 07-32495
                                                CHAPTER   7

Charles R. Streich

       Plaintiff

vs.

Mark Joseph Smith

       Defendant                              Adv. Proc. No. 07-03539

**MEMORANDUM-OPINION**

THIS ADVERSARY PROCEEDING is before the Court after the conclusion of a trial on the merits of the cause of action brought by Plaintiff against Defendant under 11 U.S.C. §§ 523(a)(2), 523(a)(4) and 523(a)(6). For the reasons set forth below, the Court determines that Defendant is entitled to a discharge under 11 U.S.C. §727 and that Defendant's debts to Plaintiff are dischargeable. By virtue of 28 U.S.C. § 157(b)(2)(I), this is a core proceeding. The following constitutes the Court's Findings of Fact and Conclusions of Law pursuant to Fed. R. Bankr. P. 7052.

FINDINGS OF FACT

This adversary proceeding arises from a business relationship gone awry. Plaintiff and Defendant are both attorneys licensed to practice law in Kentucky. In September of 1998, they, along with attorneys David Carby and Mike James, formed a business relationship working out of a shared office space located at the Chestnut Center in Louisville, Kentucky. The exact nature of their business relationship remains unclear. What is clear, however, is that all four attorneys shared

television advertising for legal services and practiced some form of personal injury law.

The trial in this adversary proceeding consisted of a series of hearings held on four separate occasions. The first set of hearings occurred on March 10 and 11, 2009. At these hearings, Plaintiff testified as to the nature of his business relationship with Defendant. Beginning in August 1998, Plaintiff formed a "partnership" with Defendant, Carby, and James to share television advertising for the purpose of generating personal injury cases. Each attorney was to contribute $1000.00 a month for advertising that ran from September 1, 1998 though May 31, 1999. Any cases generated as a result of the advertising were to be split equally among all four attorneys. Fees obtained would first be applied to any outstanding "partnership" expenses, such as court costs, with the remainder split equally among the attorneys.

Defendant, Carby, and James shared some form of business relationship and office space at the Chestnut Center prior to Plaintiff joining the group at the end of 1998. In addition to working individually on their own cases, they shared cases generated by the Watson Law Office. Following the death of Tom Watson, Defendant, Carby, and James took over the remainder of his cases, effectively closing the Watson Law Office in late 1998 or early 1999. James testified that Plaintiff did not work on any cases generated by the Watson Law Office. It was his understanding that the business relationship with Plaintiff was limited to the cases generated by the television advertising, which targeted persons injured in automobile accidents.

Plaintiff presented three memos to the Court demonstrating the existence of a "partnership" among the four attorneys. The first memo, dated August 11, 1998, purports to document the oral agreement of Defendant, Carby,[1] James, and Plaintiff to "treat any and all cases obtained from the Thomas Watson Law Office as being the property of and belonging jointly to the above named members of the joint venture." The second memo, dated August 18, 1998, purports to document the oral agreement of all four attorneys to "treat any and all cases obtained through our television advertising campaign . . . as being the property of and belonging jointly to the above named members of the joint venture." The final memo, dated January 6, 1999, purports to document the

---

[1] The hearing transcripts refer to "David Carvey," instead of "David Carby." This is a typographical error.

oral agreement of Defendant, James, and Plaintiff to "treat any and all personal injury cases obtained after January 1, 1999, by Michael James, Mark Smith and/or Charles Streich from any source, as the property of the joint venture . . . ." By December 31, 1998, Carby had left the business relationship for another job, which explains the absence of his name from the final memo.

No formal partnership or joint venture agreement was ever executed. Plaintiff testified that he drafted the three memos presented to the Court contemporaneously with conversations he had with Defendant, Carby, and James concerning their business relationship. The memos are all unsigned. Both Defendant and James testified that they had never seen the memos prior to the hearings.

Whatever was the nature of the business relationship among these four attorneys, it quickly deteriorated. On September 3, 1998, James's Kentucky law license was suspended on a rolling basis. Although he kept furniture in his office at the Chestnut Center and retained his Indiana law license, James essentially ceased to participate in the business relationship from that point on. Carby left the business relationship by the end of 1998. Thus, as of January 1999, Plaintiff and Defendant were the only attorneys ostensibly contributing to and benefitting from the cases generated by the television advertising.

At the hearings on March 10 and 11, 2009, Plaintiff presented over two hundred exhibits to the Court. The majority of these exhibits constituted "case files" that Plaintiff asserted demonstrated work he had done on behalf of the business relationship for which he had never received compensation. A typical exhibit, or case file, contained communications with an insurer on behalf of an injured client, and a final settlement receipt for personal injury protection ("PIP") subrogation reimbursement stemming from an automobile accident. Some of the files also included check stubs signifying the release of PIP funds to the client. The majority of the final settlement receipts in the case files are unsigned and "substantiated" only by Plaintiff's testimony. During his own testimony, Defendant maintained that a significant portion of these case files related to cases generated by the Watson Law Office, and not the television advertising.

A series of unfortunate events ultimately led to the dissolution of the business relationship. First, Defendant failed to secure the requisite pre-approval by the Kentucky Bar Association authorizing the television advertising campaign utilized by the attorneys. Plaintiff testified that it was Defendant's responsibility to obtain the necessary pre-approval for the television advertising

from the bar association. At some point in 1999, Plaintiff discovered correspondence from the bar association to Defendant indicating that pre-approval was never obtained. Ultimately, Plaintiff had to appear before the bar association to resolve the situation, and this generated ill-will between himself and Defendant.

Tax deficiencies, with accruing penalties and interest, also plagued the business relationship. Plaintiff presented four checks to the Court demonstrating monies he paid following the dissolution of the business relationship for tax liabilities owed from 1999 and 2000. Plaintiff also testified that one of Plaintiff's federal tax refunds was seized by the Internal Revenue Service to pay for outstanding tax liabilities stemming from the business relationship.

Finally, Defendant testified that he decided to sever his relationship with Plaintiff around October 2000 after police detectives arrived at the office to arrest Plaintiff pursuant to an emergency protective order filed by Plaintiff's wife. Although Plaintiff was not present and, therefore, not arrested at the time, Defendant explained that the fallout of his and his secretary's dealings with the police, and Plaintiff's subsequent erratic behavior, created an environment no longer conducive to a working relationship.

Both Plaintiff and Defendant agree that their business relationship ended on December 31, 2000. Although they continued to share office space into the next year, they were in the process of winding down their business affairs and resolving their remaining shared cases. Then, in January or February of 2001, Plaintiff arrived at the office one day to discover that files, office equipment, and furniture were missing. Plaintiff testified that he was unable to locate several of his personal case files, four dozen titanium steel golf balls, a personalized business card holder, and the joint check book he shared with Defendant.

Cynthia Sue Howard, a friend of Plaintiff's, happened to visit the office on the day that the items went missing. She testified that she witnessed Plaintiff and his secretary, Gina Levering, account for the missing items, and that in doing so, they discovered a back room in the shared office space containing numerous case files of which Plaintiff and his secretary appeared to be previously unaware. Howard testified that both Plaintiff and his secretary were agitated by their findings. During his own testimony, Plaintiff was adamant that Defendant secreted away these files in order to hide partnership fees generated by the advertising, and that Defendant had another secret room on another floor of the office building where he hid additional case files.

Plaintiff's testimony conflicts with that of Shannon Gibbs, Defendant's former secretary. Gibbs testified that when she worked for Defendant in 1998, Defendant did keep some files from his old cases locked in a back room. These cases, however, were separate from those generated by the television advertising. Gibbs stated that she was unaware of a secret room on another floor where Defendant kept case files.

At some point in 2001, Plaintiff moved out of his office at the Chestnut Center and ceased all association with Defendant. In January or February of 2002, Plaintiff sued Defendant in Kentucky state court for damages stemming from the dissolution of the business relationship. Documents from that proceeding have now been presented to the Court as further evidence of Defendant's alleged fraudulent behavior.

Near the end of Plaintiff's testimony on March 11, 2009, Defendant asked Plaintiff if he could provide any evidence of his having contributed the $1000 per month for television advertising expenses. Plaintiff testified that he wrote a number of personal checks on behalf of the partnership totaling a sum in excess of $30,000. Plaintiff further testified that he had already submitted copies of those personal checks into the record. When informed that only four checks written to the Internal Revenue Service had been submitted, Plaintiff stated that he would submit the remainder of the checks for the record. In light of the numerous documents presented to the Court, and the need for the parties to go through the case files together in order to designate them as either related to the business relationship or not, the Court set aside two additional days for hearing.

The second set of hearings occurred on September 8 and 9, 2009. Plaintiff again took the stand and testified as to the numerous exhibits presented to the Court that demonstrated "partnership" cases for which Plaintiff never received any portion of the fees collected. The majority of his testimony on the first day concerned how the case files indicated damages owed to him. Toward the end of his testimony, however, Plaintiff testified that because there were rarely any funds in the bank account he shared with Defendant, he had to write numerous checks drawn from his personal bank account to pay tax liabilities, his secretary's salary, and other partnership expenses. Plaintiff estimated that the checks totaled a substantial amount of money, "tens of thousands of dollars." When reminded that these checks were not in the record, Plaintiff stated that he was in possession of the checks and could provide them for the Court.

When the testimony concerning the checks continued, the Court asked Plaintiff to obtain the

checks and present them to the Court. Plaintiff stated that he had the checks at home. The Court recessed at 1:00 PM on September 8, 2009, so that Plaintiff could go home and locate the checks. When the hearing resumed at 2:41 PM, Plaintiff's counsel stated that he had located photocopies of six checks, and asked the Court for additional time to allow Plaintiff to locate and produce more checks by the end of the next day. Defendant did not object, and the Court granted counsel's request for additional time.

The following day, on September 9, 2009, Plaintiff's counsel tendered to the Court photocopies of the front side of numerous checks drawn from Plaintiff's personal bank account. Originals of the checks were not presented to the Court. From the outset of the hearing, Defendant objected to the admission of the checks on the basis that they lacked foundation and appeared to be altered. Upon further examination, the Court agreed that there were strange markings on the photocopied checks that suggested that the original checks had been altered with white-out and then photocopied. The Court instructed Plaintiff's counsel to call Plaintiff, who was running late and not yet at the courthouse, and inform him that the originals were needed to eliminate the Court's concern that the checks may be altered. As Plaintiff had not yet arrived, Plaintiff's counsel resumed his direct examination of Defendant on other matters. When Plaintiff arrived, the Court inquired as to the originals of the checks and Plaintiff responded that he only possessed the photocopies submitted to the Court. Plaintiff stated that the photocopies were provided to him by his bank years ago. Defendant inquired as to whether or not the originals could be obtained directly from the Bank of Louisville, where Plaintiff maintained his personal checking account.

Inquiry as to the checks revealed that Bank of Louisville no longer exists, and that Branch Banking and Trust Company ("BB&T") now possesses Bank of Louisville's records. The Court granted an agreed order to have BB&T produce the records on September 9, 2009. On October 16, 2009, the Court received the copies of the checks provided by BB&T.

The checks provided by BB&T substantially differ from those tendered by Plaintiff to the Court. For example, the photocopy of check number 1664 tendered by Plaintiff to the Court is paid to the order of "Mark Smith" for three hundred dollars. "P/ship expenses" is written on the memo section of the check. The microfiche copy of check number 1664 provided by BB&T is paid to the order of "Warren Bosch" for three hundred dollars, and "painting" is written in the memo section. Clearly, the original copies of checks processed by Bank of Louisville/BB&T have been altered

6

prior to presentation as evidence to this Court.

On October 28, 2009, the Court held a status hearing and presented to both parties[2] copies of the checks tendered by Plaintiff to the Court along with copies of the checks provided by BB&T. An evidentiary hearing as to the limited issue of the checks was scheduled for November 24, 2009.

Extemporaneous to these proceedings, Plaintiff had an ongoing problem with retaining counsel. Plaintiff's attorney[3], Joseph Elder, moved to withdraw as counsel for Plaintiff four days after the Court's status hearing, on November 3, 2009. The Court granted the motion and gave Plaintiff until November 13, 2009 to find counsel to represent him at the hearing on November 24, 2009.

Plaintiff appeared without counsel at the hearing on November 24, 2009. Although he stated that he had been able to retain counsel by the hearing date, his counsel was unable to appear in court due to a preexisting obligation. The Court allowed Defendant to call Plaintiff to the stand, but when Plaintiff refused to do so, the Court allowed Defendant to proceed with his own testimony. Defendant then testified as to the clearly observable discrepancies between the checks tendered by Plaintiff to the Court and the checks provided by BB&T.

A final hearing in this matter was held on December 10, 2009. At the beginning of the hearing, the Court granted the motion of Plaintiff's third attorney, Eric Zagrans, to appear pro hac vice. Plaintiff then testified as to the alterations on the checks.

Plaintiff explained that it was his practice, after receiving a cleared check back from the bank, to white out the name to whom the check was written and in its place write in other another name to trigger in his memory the purpose for which had written the check. In Plaintiff's own words,

> When I got those checks back from the bank – and, again, there was some issue with some – during that time period, sometimes I got original checks back, sometimes I got photocopies from the bank. And I made notes for my own personal reference – for my own record keeping purposes – so I would know what the check went for

---

[2]Although Plaintiff's attorney was present at the status hearing, Plaintiff himself chose not to attend.

[3]Mr. Elder is Plaintiff's second attorney of record. Plaintiff's first attorney in this action, Mark Robinson, withdrew in January of 2008 due to "irreconcilable differences" between himself and Plaintiff.

7

> because, you know, I could very well subsequently have forgotten. If I just saw my name on a check, I might not have remember that it was written to the partnership to – directly to or on behalf of the partnership or directly to or on behalf of Mark Smith.

Plaintiff explained that he gave the checks to his secretary,[4] and under his direction, "she whited out more than needed to be whited out, but she whited out the payee, and I subsequently wrote Mark Smith." Plaintiff acknowledged the unorthodox nature of his record keeping method, yet justified it as his previous business practice as a sole practitioner, and his inexperience in generating business records as part of a partnership. The Court finds that Plaintiff's "explanation" here strains credulity to say the least and, at best, lacks credibility.

Next, Plaintiff's counsel offered into evidence several original checks that Plaintiff had previously testified he did not possess. Notably, all but one of the original checks did not the have any white-out on them. On cross-examination, Plaintiff attempted to explain this discrepancy from his prior testimony by stating that his bank sometimes returned to him original checks and sometimes photocopies, and he made his white-out notations on whatever was provided to him by the bank.

Plaintiff proceeded to testify as to several of the individual checks, again without any credibility. One of these checks was check number 1664, already described in this opinion, as originally written to Warren Bosch and altered by Plaintiff for record keeping purposes, as payable to Defendant. Plaintiff testified that he recommended Bosch, a painter, to Defendant for work Defendant was having done at his home. Plaintiff explained that Bosch approached him after he failed to receive payment from Defendant for the painting. Plaintiff testified that his solution to this problem was to write Bosch a personal check for the work done. He explained, "When I got my canceled checks, I subsequently made the notation that I did so that I would remember what it was for because, I, in all likelihood, would have forgotten if I hadn't made a note as to why I paid Warren Bosch." Plaintiff testified that he paid Bosch for the work performed at Defendant's home to maintain his relationship with Bosch.

At the close of the hearing on December 10, 2009, Plaintiff's counsel withdrew some of the checks previously presented to the Court as proof of partnership expenses paid by Plaintiff. The

---

[4]Unfortunately, Plaintiff's former secretary did not testify in this case.

8

final two exhibits of original checks offered as proof total $50,573.99. Plaintiff's Supplemental Exhibit One contains original checks that purportedly represent $34,387.66 paid by Plaintiff for various partnership expenses. Plaintiff's Supplemental Exhibit Three contains original checks that purportedly represent $16,186.33 paid by Plaintiff to his secretary, Gina Levering, as salary. Plaintiff argues that these checks, plus the case files and four checks written to the Internal Revenue Service, constitute his claim for denial of discharge.

Finally, the Court gave the parties the opportunity to file post-trial briefs. Neither party chose to do so.

## CONCLUSIONS OF LAW

Plaintiff seeks denial of a discharge to Defendant under 11 U.S.C. §§ 523(a)(2)(A), 523(a)(4) and 523(a)(6). To prevail, Plaintiff must prove each of the elements of those sections of the Bankruptcy Code by a preponderance of the evidence. *See Grogan v. Garner*, 498 U.S. 279, 291 (1991). The Bankruptcy Code should be construed liberally in favor of the debtor. *In re Keeney*, 227 F.3d 679, 683 (6th Cir. 2000).

## 11 U.S.C. § 523(a)(2)(A)

To obtain an exception from discharge under 11 U.S.C. § 523(a)(2)(A), a plaintiff must prove each of the following essential elements: (1) the debtor obtained money through a material misrepresentation that, at the time, the debtor knew was false or made with gross recklessness as to its truth; (2) the debtor intended to deceive the creditor; (3) the creditor justifiably relied on the false representation; and (4) the creditor's reliance was the proximate cause of loss. *See In re Rembert*, 141 F.3d 277, 280-81 (6th Cir. 1998). The debtor's intent is assessed by a subjective standard looking at the totality of the circumstances, and all exceptions to discharge are to be strictly construed against the creditor. *Id.* at 281-282.

Plaintiff alleges that Defendant misappropriated assets either belonging to Plaintiff or shared by the business relationship by removing cases generated by the shared television advertising and refusing to pay Plaintiff his share of the fees generated by those cases. As evidence of Defendant's intention to deceive him, Plaintiff offers his own contested testimony as to his discovery of cases files supposedly secreted away by Defendant in a back room of their shared office space and on another floor of the Chestnut Center. Plaintiff also offers numerous checks supposedly written by

him from his personal bank account as evidence of partnership expenses he paid to Defendant.

The Court finds Plaintiff's allegations completely unsupported by the record before it. Plaintiff's testimony is contradicted by apparently disinterested witnesses, James and Gibbs, and is riddled with speculation and at best dubious explanations. For this reason, the Court concludes that Plaintiff has failed to meet his burden of proof of demonstrating any of the four elements necessary to establish an exception to discharge under 11 U.S.C. § 523(a)(2)(A).

## 11 U.S.C. § 523(a)(4)

Under 11 U.S.C. § 523(a)(4), three distinct acts of malfeasance can create an exception to discharge, including "fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." To withhold a debt from discharge for "fraud or defalcation while acting in a fiduciary capacity," the Court must find that an express or technical trust existed between the parties. *Brady v. McAllister* (*In re Brady*), 101 F.3d 1165, 1173 (6th Cir. 1996). The term fiduciary under section 523(a)(4) "does not extend to implied trusts, which are imposed on transactions by operation of law as a matter of equity." *Id.* (quoting *Riden v. Sigler* (*In re Sigler*), 196 B.R. 762, 764 (Bankr. W.D. Ky. 1996)).

The term "fiduciary capacity," however, does not modify the words "embezzlement" or "larceny." *Bailey v. James (In re James)*, 42 B.R. 265, 267 (Bankr. W.D. Ky. 1984). The Court need not find a fiduciary relationship existed to hold the debt nondischargeable on the grounds of embezzlement or larceny. *Id.* To succeed on a theory of embezzlement, the Plaintiff must prove that "(a) the Debtor appropriated funds for his own benefit, and (b) he did so with fraudulent intent or deceit. Both the intent and the actual misappropriation necessary to prove embezzlement may be shown by circumstantial evidence." *Id.* To succeed on a theory of larceny, the Plaintiff must show that the Defendant has "wrongfully and with fraudulent intent taken property from its owner." *Kaye v. Rose (In re Rose)*, 934 F.2d 901, 903 (7th Cir. 1991).

In this case, Plaintiff alleges that, as a member of a partnership, Defendant owed him a fiduciary duty to abstain from fraud or defalcation. Plaintiff does not allege embezzlement or larceny on the part of Defendant. Therefore, to succeed on this action, Plaintiff must demonstrate the existence of an express or technical trust between the parties.

"To establish the existence of an express or technical trust, a creditor must demonstrate: '(1)

10

an intent to create a trust; (2) a trustee; (3) a trust res; and (4) a definite beneficiary.'" *Bd. of Trs. of the Ohio Carpenters' Pension Fund v. Bucci (In re Bucci)*, 493 F.3d 635, 640 (6th Cir. 2007) (quoting *In re Blaszak*, 397 F.3d 386, 391-92 (6th Cir. 2005)).  Here, Plaintiff has offered no evidence or testimony to establish the existence of an express or technical trust between himself and Defendant.  The memoranda offered by Plaintiff as evidence of the existence of a "partnership" with Defendant are self-serving and specious, at best.  While there is no question that Plaintiff and Defendant worked together in some capacity, there is no evidence that Defendant owed a fiduciary duty to Plaintiff. Furthermore, as with the claim discussed above, there is no proof that Defendant made material representations to Plaintiff or that he intended to defraud him.  Accordingly, Plaintiff's claim must fail.

## 11 U.S.C. § 523(a)(6)

To establish that a debt is nondischargeable under 11 U.S.C. §523(a)(6), a plaintiff must prove that the debtor not only intended the act that caused the harm, but intended the harm.  *See Kawaauhau v. Geiger*, 523 U.S. 57, 61-62 (1998).

In this case, as with the claims discussed above, Plaintiff failed to provide any proof that Defendant made material misrepresentations to Plaintiff or that he intended to harm him.  Therefore, this claim, too, fails.

## Defendant's Counterclaims

At the close of the trial upon the merits, the Court advised the parties that it intended to bifurcate consideration of Plaintiff's claims and Defendant's counterclaims, with consideration of Defendant's counterclaims at a later date if Defendant chose to pursue them after the Court's decision regarding Plaintiff's claims.  Accordingly, the Court will now give Defendant thirty (30) days from the entry hereof to notify the Court of his desire for the Court to consider his counterclaims.  Defendant will also have the same amount of time to inform the Court if he wishes to pursue an award of attorney fees against Plaintiff under 11 U.S.C. § 523(d).

A separate Order consistent with the foregoing has been entered in accordance with Federal Rule of Bankruptcy Procedure 9021.

11